1  BRIAN STRETCH (CABN 132612)
   Acting United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  KATHRYN HAUN (DCBN 484131)
   WILLIAM FRENTZEN (LABN 24421)
5  Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7200
         FAX: (415) 436-7234
8        Kathryn.haun@usdoj.gov
         William.frentzen@usdoj.gov
9
   RAYMOND N. HULSER (MABN 551350)
10 Chief, Public Integrity Section

11 RICHARD B. EVANS (DCBN 441494)
   Trial Attorney
12
         1400 New York Avenue, N.W.
13       Washington, D.C. 20005
         Telephone: (202) 353-7760
14       Richard.B.Evans@usdoj.gov

15 Attorneys for United States of America

16

17                      UNITED STATES DISTRICT COURT

18                      NORTHERN DISTRICT OF CALIFORNIA

19                             SAN FRANCISCO DIVISION

20
   UNITED STATES OF AMERICA           )   NO. CR 15-CR 319 RS
21                                    )
        v.                            )   UNITED STATES' SENTENCING
22                                    )   MEMORANDUM
   CARL MARK FORCE IV                 )
23 (A/K/A "FRENCHMAID"),              )
                                      )   Date: October 19, 2015
24      Defendant.                    )   Time: 3:00 p.m.
                                      )
25 _____      )

26

27

28

                                      1

*"Corruption of the best is the worst."* – Translated from the Latin maxim *Corruptio optimi pessima* (reprinted in *Of Superstition and Enthusiasm* by David Hume*)*

The defendant, former DEA Special Agent Carl Mark Force IV, stands to be sentenced on his convictions following guilty pleas for (1) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A) and (B); (2) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and (3) extortion under color of official right, in violation of 18 U.S.C. § 1951.

Although the government concurs with the Probation Department's description of the offense conduct and its calculation of the applicable sentencing guidelines, it does not concur with the Probation Department's sentencing recommendation of a low-end sentence, much less the defendant's recommendation of a downward departure. Carl Force is not someone who deserves a sentence at or below the low end of things. Carl Force is someone who abused the public trust and tarnished the reputation of law enforcement in the process. For those reasons and the others discussed below, the United States seeks a high-end guidelines sentence of 87 months imprisonment. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals the Court is statutorily directed to take into account.[1]

## I. THE APPLICABLE GUIDELINES RANGE

The government agrees with Probation's Presentence Report (PSR) that the adjusted offense level is 27. *See* PSR ¶ 73. That offense level includes various sentencing enhancements, to include an enhancement for obstruction of justice with respect to the investigation of this offense. PSR ¶ 68. In terms of criminal history, the defendant has one 2002 misdemeanor conviction for driving under the influence of alcohol and carrying a concealed firearm stemming from when he was a federal agent in Colorado, *see* PSR ¶ 76, putting him in a Criminal History Category I. A total offense level 27 and a Criminal History Category I results in a range of 70 to 87 months under the U.S. Sentencing Guidelines. PSR ¶ 116.

---

[1] In determining the appropriate sentence, this Court must conduct a two-step inquiry: (1) first correctly calculate the applicable Guidelines range as the starting point, and then (2) assess the factors set forth in 18 U.S.C. § 3553(a) to fashion an individualized sentence that is sufficient, but not greater than necessary, to achieve the aims of the sentencing statute. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

## II. LEGAL FRAMEWORK

In sentencing the defendant, this Court must consider the factors set forth in 18 U.S.C. § 3553(a) including: the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing guideline range, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims of the offense. Those goals include the need to reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a).

## III. APPLICATION OF THE SENTENCING FACTORS COMPELS A HIGH END SENTENCE IN THIS CASE

### A. The Offense Conduct Is Particularly Egregious As It Erodes Public Confidence In the Criminal Justice System And Tarnishes Law Enforcement

The Court is already familiar with the detailed charging document that discusses the defendant's conduct and it also sat through his lengthy plea colloquy. Suffice it to say that the defendant's betrayal of the public trust in this case is staggering:

- ➢ He created numerous fictitious personas through which he extorted the target of his own criminal investigation, offering in exchange not to provide the government with the target's identity and effectively serving on that target's payroll, conning not only the target but also the government in the process;

- ➢ He stole and converted to his own personal use hundreds of thousands of dollars worth of bitcoins that he received in his official capacity and deposited them into his own personal accounts;

- ➢ He used his official position to illegally run criminal checks on individuals to benefit a third-party company and was moonlighting as that company's Chief Compliance Officer all while employed as a federal agent;

3

- ➢ He essentially performed a "shakedown" by unlawfully seizing hundreds of thousands of dollars in digital currency belonging to a third-party victim and transferring it to his own personal account;

- ➢ He concealed his corrupt conduct by purposefully failing to document certain actions in his file and encrypting communications with Ulbricht so that they could not be viewed by other agents;

- ➢ He forged and served an official Department of Justice subpoena on a company and directed it to take action with respect to his own personal account, and then attempted to conceal evidence of his improper conduct by threatening the company with legal action and suggested to another agent to seize its bank accounts; and then when he was caught,

- ➢ He covered his tracks by placing evidence of his wrongdoing in a burn bag and lying about all of the foregoing conduct to federal prosecutors and agents.

In providing the defendant with a gun and a badge, the government entrusted him to act in a manner consistent with standards becoming a sworn law enforcement officer, namely to protect and serve the public. Conduct like Force's undermines public confidence in law enforcement and threatens the credibility of the entire criminal justice system. Unfortunately, it does not take more than one or two corrupt federal agents to overshadow the consistent and heroic work done by 99.9% of their colleagues. The national media doesn't publish articles about the agents who are the first responders in active shooter incidents, who risk their lives in undercover capacities, who respond to live hostage situations, who root out financial fraud and uncover terrorist plots – they publish articles about the corrupt behavior of people like Carl Force and Shaun Bridges. Simply put, when the badge is tarnished it impacts every single law enforcement officer who wears it and every citizen who relies on it for protection.

**B.  Defendant's Conduct Was Not A Single Lapse in Judgment But A Continued Course of Conduct That Became Ever More Egregious**

This Court comes across plenty of defendants who have committed a single -- yet significant -- error in judgment who might deserve a break when it comes time for sentencing. This is not one of those defendants. His crimes do not represent a "one-off" where he experienced a momentary lapse of judgment. Instead, Force committed crimes over the course of many months (if not years) during which

he had time to reflect on what he was doing over and over again. Yet instead of ceasing his misconduct after one incident, he continued with impunity until he was caught. His was an extremely calculated effort, designed to avoid detection for as long as possible, ironically using the very skills (e.g. encryption, TOR, etc.) that he learned on the job and on the public's dime.

The defendant's crimes began with creating the fictitious persona of "Death From Above" and attempting to extort $250,000 from Ross Ulbricht which, presumably, the defendant would have kept had Ulbricht paid. *See* PSR ¶¶ 21-25. But Force did not stop there. In June 2013 he received 400 bitcoin from Ulbricht in his official undercover role as "Nob" and simply deposited it in his own account. *Id*. ¶ 26. When some two months later Ulbricht paid him again, this time 525 bitcoin, he once again pocketed those funds. *Id*. ¶ 28. Thereafter, Force continued his deception by creating a fictitious report stating that Ulbricht had never made the payment. *Id*. He then expanded the scope of his fraud in September 2013 and created a second persona, "French Maid," with which to fraudulently obtain money from Ulbricht, lulling him into paying approximately $100,000 worth of bitcoin for information into Force's own investigation. *Id*. ¶ 30.

Force was also at the center of a stranger than fiction murder-for-hire plot involving a Silk Road Administrator-turned-government-cooperator, C.G. Force, his co-defendant Shaun Bridges, and two of their fellow Baltimore Silk Road agents, arrested C.G. for a controlled delivery of a kilogram of cocaine. *See* PSR ¶ 50. C.G. flipped and cooperated with the government, and Force became his handler. *Id*. As part of the cooperation, C.G. provided his Silk Road administrative login and user credentials to these Baltimore agents. Within a day, Shaun Bridges used C.G.'s login, password, and other credentials to steal nearly 20,000 bitcoin from various Silk Road accounts, making it look as if C.G. had committed the theft. Ulbricht believed C.G. was to blame and ordered a hit on him. Ironically, Ulbricht commissioned "Nob" for the hit – which was actually the defendant Carl Force in his then-undercover capacity. *See* Criminal Complaint 3-15-70370-MEJ (Complaint) at 43-44. Force and his fellow agents, including Shaun Bridges, then worked to stage C.G.'s death, pretending to waterboard him and documenting it with photos which were to be provided to Ulbricht to make it appear as if C.G. was dead. *Id.* Force cautioned C.G. to stay home and lay low so the death would be believable. Meanwhile, Force frequently called C.G. for advice on how to infiltrate the Silk Road website and how to move bitcoin –

tips Force put to work not for his official duties but rather to cover up his own crimes. *See* PSR ¶ 52. Months later, Force used C.G.'s identity and account with Dwolla both to steal money and to launder his (Force's) own criminal proceeds. *Id.* ¶¶ 50-52. C.G.'s statement in the PSR speaks for itself, *see* PSR ¶ 52, about how C.G. trusted that Force would be there for him when it came time to make the Court aware of his assistance to the government. Instead, after working with Bridges and others to fake C.G.'s death and effectively leave him housebound, Force used C.G. for tips and information to commit his own crimes, and helped himself to C.G.'s digital currency accounts. *Id.*

Nor did Force's fraud end with Ulbricht and the Silk Road administrator-turned-cooperator. Nearly a year later, rather than reflecting on his prior bad acts and choosing not to make the same poor decisions again, he instead became more brazen: In Spring 2014 he seized the bulk of a third-party's life savings simply because that savings happened to have been in the form of digital currency. *Id.* 34-37. When that individual sought to get his money back, he was told that the government had instructed it be frozen and that his point of contact going forward would be Carl Force. *See generally* Complaint at 29-30. It is hard to imagine how daunting it would be to be told that the federal government had arbitrarily seized one's savings.[2] To date, that victim is still out the money unless and until this Court orders restitution at sentencing. To accomplish this theft, Force used CoinMKT, a company in which he moonlighted as a Chief Compliance Officer. And when CoinMKT expressed concern, Force followed up with a U.S. Department of Justice subpoena. CoinMKT believed it had no choice but to comply given that Force was a federal agent and they were a small startup company in a fledgling industry that did not want to draw the ire of the federal government. *See id.* at 30.

By the time that another company, Venmo, was threatening to blow the whistle on Force's improper use of a Justice Department subpoena, Force again misused his position to try and intimidate them from inquiring further, threatening legal action and also writing to another IRS Agent on the Baltimore Silk Road Task Force that he wanted to explore, "seiz[ing Venmo's] bank accounts . . . á la

---

[2] But we do know that as a result of this episode, this victim became so distrustful of the government that during the investigation into Force, he initially refused to talk to anyone working with law enforcement or the government at all because he did not know whom he could trust. Eventually, following the charges in this case he filed a victim impact statement in which he stated he was "greatly affected" by Force's conduct and seizure of money. *See* PSR ¶ 50.

BRIDGES and [M.M.'s] seizure warrants for Mt. Gox." *See generally* PSR ¶ 40-42; *see also* Complaint at 35.

The defendant had a final opportunity to come clean for his crimes and take responsibility when, in May 2014, he was confronted by federal prosecutors and agents. He was asked point blank about his role in some of this conduct and he lied repeatedly during a lengthy interview. This forced the government to embark on an intricate and time-intensive investigation, taking resources away from other cases in the process. To the defendant's credit, when he was eventually charged with these crimes he readily acknowledged his role and swiftly indicated his intent to plead guilty. He did so at his first appearance before this Court. Indeed, this is one of the reasons that the government is recommending a guidelines sentence in this case and not seeking an upward departure, given the government's obvious interest in incentivizing those who are guilty to resolve their cases short of trial. But the Court should take into account that the defendant's offenses were a continued course of conduct that spanned a relatively long period of time, a period in which there was ample opportunity for the defendant to reflect on what he had been doing and realize it was very wrong.

### C. Defendant's Conduct Jeopardized A Sensitive, Multi-Year, Multi-Agency Investigation

The defendant was part of the Baltimore Silk Road Task Force, which, together with the U.S. Attorney's Office for the District of Maryland, had been pursuing an investigation against the Silk Road operator, Ross Ulbricht. This task force was comprised of numerous agencies – IRS, USPIS, DEA, and HSI – and it had been working on the investigation into the Silk Road for years. Given Force's role as *the* undercover agent on that case in communication with Ulbricht, it would have been obvious to Force as a longtime federal agent that he would be a key, if not *the* key, witness for the government in any future prosecution in Maryland. In stealing money, creating unauthorized personas and having encrypted ultra vires communications, Force acted with reckless disregard for the potential for his actions to jeopardize the very case he was tasked with building. Rather than working to take down the Silk Road – what he was being paid with taxpayer dollars to do – Force lined his own pockets.

7

### D. A Lengthy Prison Sentence Is Needed To Promote Both Deterrence And Promote Respect For the Law

A long sentence is also important to afford adequate deterrence to criminal conduct in the future – not only by Force but by any other would-be corrupt official within the government. The Court should send a message that this kind of conduct will be met with a harsh penalty in the form of a high-end prison sentence. A message of leniency communicates to other potentially corrupt government officials that the possibility of prison might be worth the risk in order to profit several hundred thousands or millions of dollars. Because a trustworthy workforce is absolutely essential to the mission of the Department of Justice and the myriad other federal and state agencies who serve the public, deterring this kind of behavior is of the upmost importance. Other government employees will look to what sentence Force gets as an example of what could happen to them if they were to betray the public trust. The message, accordingly, must be that this kind of conduct will result in a very lengthy custodial sentence.

Finally, Section 3553(a)'s provision for a sentence that "promotes respect for the law" must also be considered. At the time of his criminal activity, the defendant's legitimate work with the DEA was busting drug dealers, arresting them and charging them with drug crimes that carry significant custody time. In the midst of all of this he was stealing money and property from others. In his off-time, he was investing the proceeds of that criminal activity in a business that he worked for on the side, without approval, and striking movie and book deals with a Hollywood studio. It is critical that people understand and believe that when a law enforcement agent gets caught doing these kinds of things, he will be dealt with severely by the system of which he was once a part.

### IV. THERE IS NO BASIS FOR A DOWNWARD DEPARTURE BASED ON DIMINISHED MENTAL CAPACITY BECAUSE THE DEFENDANT WAS NOT SUFFERING FROM A SIGNIFICANTLY REDUCED MENTAL CAPACITY THAT CONTRIBUTED SUBSTANTIALLY TO THE OFFENSES

Finally, a variance from the Sentencing Guideline range, for any reason, is not appropriate. The government anticipates that the defendant will advance the argument that he should be subject to a lower than guidelines sentence by reason of his mental health. This should be rejected.

U.S. Sentencing Guidelines § 5K2.13 specifies that a downward departure may be warranted for diminished capacity if (1) the defendant committed the offense while suffering from a *significantly reduced* mental capacity; *and* (2) the significantly reduced mental capacity contributed *substantially* to the commission of the offense (emphasis added). In *United States v. Cantu*, 12 F.3d 1056 (9th Cir. 1993), the Ninth Circuit held that "in everyday language, 'reduced mental capacity' refers to a lack of full intellectual functioning. It connotes an impairment of the intellect, a failure to be able to quickly and fully grasp ordinary concepts . . . [it] comprehends both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgments."

Although the government does not doubt that the defendant suffers from severe depression and anxiety, that fact does not separate him from many other defendants who come before this Court for sentencing. To justify a downward departure Force must demonstrate that he meets the requirements of Section 5K2.13 that his mental capacity was "significantly reduced" *and* that it contributed "substantially" to the crimes here. He has not demonstrated either of those things. The government bases its opinion in this regard on the findings of its retained expert, Dr. Daniel A. Martell. Dr. Martell is an experienced psychologist who has served as an expert in dozens if not hundreds of state and federal cases, and who personally evaluated the defendant and his medical records. Dr. Martel's expert report and findings are attached herewith as Exhibit A filed under seal.[3] In Dr. Martell's professional opinion, Force's mental capacity was not significantly reduced at the time he committed the offenses. *See* Exhibit A at 9 (emphasis added). Dr. Martell's conclusion is based, inter alia, on the fact that the defendant's own treatment records from Sheppard-Pratt Behavioral Health center in Maryland "consistently indicate that he was 'doing well.'" *Id.* at 6. It is also based on the fact that Force was cleared for return to full duty without restrictions in May 2010 by his doctors, and his treatment records

---

[3] Despite that the defendant expressly waived his right to any medical privacy as part of his Plea Agreement, the government believes that it can address the defendant's argument without the need to publicly-file his medical evaluation. Accordingly, the government proposes to file Dr. Martel's report under seal with the Court. A Proposed Order is attached.

indicate that his symptoms were well-controlled by his medication regimen, his condition was described as "stable," and he was described as "doing well" behaviorally. *Id.* Thus, Dr. Martell has concluded that although Force carried a "psychiatric diagnosis [of Major Depressive Disorder and an Anxiety Disorder], the treatment records indicate that he was functioning within normal limits, and therefore *his mental capacity was not 'significantly reduced'* at the time he committed the offense." *Id.* at 9-10. Even if Force's mental capacity was *significantly* reduced at the time, and based on Dr. Martell's analysis the government believes it was not, the defendant likewise cannot demonstrate that his mental capacity contributed *substantially* to the crimes. As to that question, Dr. Martell's expert opinion is that "while his symptoms may have played some role in his exercise of poor judgment surrounding the offense, he did not suffer from significantly reduced mental capacity that *substantially* contributed to the commission of the crime." *Id*. at 10 (emphasis added). For these reasons, there is no basis for the Court to depart downward.

**CONCLUSION**

The government submits that only a high end sentence is reasonable and appropriate in this case given the nature and circumstances of the offense, the need to promote respect for the law, and for purposes of deterrence. In full consideration of these sentencing goals, together with the defendant's history and characteristics, the United States respectfully requests that the Court impose a sentence of 87 months imprisonment, as well as a 3 year term of supervised release and full restitution to the victims identified by the Probation Department.

DATED: October 9, 2015            Respectfully submitted,

BRIAN J. STRETCH
Acting United States Attorney


_____/s/_____
KATHRYN HAUN
WILLIAM FRENTZEN
Assistant United States Attorneys

RICHARD B. EVANS
Public Integrity Section