1  BRIAN STRETCH (CABN 132612)
   Acting United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  KATHRYN HAUN (DCBN 484131)
   WILLIAM FRENTZEN (LABN 24421)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7200
        FAX: (415) 436-7234
8       Kathryn.haun@usdoj.gov
        William.frentzen@usdoj.gov
9
   RAYMOND N. HULSER (MABN 551350)
10 Chief, Public Integrity Section

11 RICHARD B. EVANS (DCBN 441494)
   Trial Attorney
12
        1400 New York Avenue, N.W.
13      Washington, D.C. 20005
        Telephone: (202) 353-7760
14      Richard.B.Evans@usdoj.gov

15 Attorneys for United States of America

16

17                    UNITED STATES DISTRICT COURT

18                   NORTHERN DISTRICT OF CALIFORNIA

19                         SAN FRANCISCO DIVISION

20
   UNITED STATES OF AMERICA           )  NO. CR 15-CR 319-001 RS
21                                    )
        v.                            )  UNITED STATES' SENTENCING
22                                    )  MEMORANDUM
   SHAUN W. BRIDGES                   )
23 (A/K/A "NUMBER 13"),               )
                                      )  Date: December 7, 2015
24      Defendant.                    )  Time: 3:00 p.m.
                                      )
25 _____  )

26

27      *"Worthy of Trust and Confidence"* – The motto of the U.S. Secret Service
28

1

The defendant, former Secret Service Special Agent Shaun W. Bridges, stands to be sentenced on his convictions following guilty pleas for (1) money laundering, in violation of 18 U.S.C. § 1957; and (2) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2).

The government concurs with the Probation Department's description of the offense conduct and its calculation of the applicable sentencing Guidelines, which includes the application of a 2-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). The appropriate Guidelines range is 57 to 71 months, and neither a downward variance nor a low-end sentence is warranted in this case. By his egregious conduct and flagrant abuse of his authority as a sworn law enforcement officer, Shaun Bridges has shown that he is not someone who deserves a sentence at or below the low end of the Guidelines range. Rather, Shaun Bridges is someone who abused the public trust and tarnished the reputation of law enforcement in the process. For those reasons and the others discussed below, the United States seeks a high-end Guidelines sentence of 71 months' imprisonment – the same sentence recommended by the Probation Department. *See* PSR, Sentencing Recommendation at p. 2. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals the Court is statutorily directed to take into account.[1]

## I.   THE APPLICABLE GUIDELINES RANGE

The United States agrees with Probation's Presentence Report (PSR) that the adjusted offense level is 28. *See* PSR ¶ 49. That offense level includes various sentencing enhancements, including an enhancement for obstruction of justice with respect to the investigation of this offense. PSR ¶ 68. The defendant has no prior criminal convictions, *see* PSR ¶¶ 55-6, putting him in a Criminal History Category I. PSR ¶ 58. Accordingly, a total offense level 25 and a Criminal History Category I results in a range of 57 to 71 months under the U.S. Sentencing Guidelines. PSR ¶ 91.

---

[1] In determining the appropriate sentence, this Court must conduct a two-step inquiry: (1) first correctly calculate the applicable Guidelines range as the starting point, and then (2) assess the factors set forth in 18 U.S.C. § 3553(a) to fashion an individualized sentence that is sufficient, but not greater than necessary, to achieve the aims of the sentencing statute. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

**A.     The PSR Accurately Applies A 2-level Enhancement For Sophisticated Means Under 2B1.1(b)(10)(C)**

Although the defendant does not object to the base offense level, he has lodged an objection, without legal support, to the application of the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C). On the contrary, the PSR accurately concludes that the offense in this case – money laundering – involved sophisticated means. *See* PSR ¶ 44. Section 2B1.1(b)(10)(C) provides for a 2-level enhancement where "the offense otherwise involved sophisticated means[.]" The Application Notes define sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Application Notes to 2B1.1(b)(10)(C); *see also United States v. Young*, 537 F. App'x 777, 781 (9th Cir. 2013) (applying the enhancement where defendant "used multiple accounts and corporations as part of his fraudulent scheme"); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (applying enhancement where defendant "manipulated several people to lie for him, used several different bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents"). However, "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement" and "the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1145, 1147 (9th Cir. 2013).

In this case, Bridges engaged in precisely the type of sophisticated means that the Application Notes to 2B1.1(b)(10)(C) contemplated. Bridges stole bitcoins from various Silk Road accounts using the log-in credentials from one of the website's customer support representatives – a target whom they had arrested – and transferred the bitcoins to Mt. Gox, an offshore bitcoin exchange company in Japan. PSR ¶ 22. Over several months, Bridges then made nine separate wire transfers – all under $100,000 each – totaling $822,851.19 from the offshore exchange to a Fidelity account in the name of Quantum

3

International Investments, LLC ("Quantum"), a shell corporation Bridges created in the United States, and for which he went to the trouble of filing LLC paperwork with the State of Maryland. PSR ¶¶23, 25. The sole and exclusive purpose of this LLC was to receive and hide these criminal proceeds. Bridges did not engage in garden-variety fraud; he employed sophisticated means through offshore accounts and shell corporations. Further, as the PSR notes, bitcoin is a sophisticated technology/currency. PSR ¶ 44. Accordingly, this Court should apply the 2-level enhancement for sophisticated means.

### B.  Alternatively, The Court Could Apply A 2-level Enhancement Under 2B1.1(b)(10)(B) Because A Substantial Part Of The Fraud Was Committed Outside The United States

Even if the sophisticated means enhancement did not apply, a 2-level enhancement still would be appropriate because "a substantial part of a fraudulent scheme was committed from outside the United States[.]" U.S.S.G. § 2B1.1(b)(10)(B). Substantial means "an important material matter, thing, or part[.]" *United States v. Ogunbanke*, No. 13-50600, 2015 WL 4523215, at *1 (9th Cir. July 27, 2015); *see also United States v. Bagby*, 550 F. App'x 364, 365 (9th Cir. 2013) (applying 2B1.1(b)(10)(B) where, *inter alia*, there was evidence of a wire transfer between the U.S. and the U.K. as well as other cross-border activity); *United States v. Fauncher*, 464 F. App'x 674, 675-76 (9th Cir. 2012) (applying 2B1.1(b)(10)(B) where defendant knew funds from a multi-level phishing scheme came from overseas). To apply, the fraudulent scheme need not originate from outside the United States. *See United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002).

In this case, a substantial part of the fraudulent scheme was committed in Japan. Bridges stole bitcoins from Silk Road accounts and transferred them to an offshore bitcoin exchange in Japan where they remained for several months before he converted the bitcoins to cash and transferred the funds from Mt. Gox to a Fidelity account in the United States. PSR ¶¶ 22-23, 25. Storing the bitcoins in Japan was a substantial part of the fraudulent scheme because it allowed Bridges to conceal the bitcoins before

converting them to cash, which he then transferred to the United States. To be sure, the fraudulent scheme originated in the United States when Bridges stole the bitcoins; however, a scheme need not originate from outside the United States in order for 2B1.1(b)(10)(B) to apply. *Id.* Moreover, the use of Mt. Gox required law enforcement in this investigation to engage with foreign law enforcement and ultimately travel to Japan to solve this crime. That expense and barrier to solving the crime warrants extra punishment because there were real world consequences – it is not a simple technical application of the Guideline. Incredibly, just days after using Mt. Gox to accomplish his scheme, Bridges served as the affiant on a seizure warrant for Mt. Gox in which millions of dollars were seized by U.S. authorities. Accordingly, this Court could also apply the 2-level enhancement because a substantial part of the fraud was committed outside of the United States.

## II. LEGAL FRAMEWORK

In sentencing the defendant, this Court must consider the factors set forth in 18 U.S.C. § 3553(a) including: the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing Guidelines range, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims of the offense. Those goals include the need to reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a).

## III. APPLICATION OF THE SENTENCING FACTORS COMPELS A HIGH END SENTENCE IN THIS CASE

### A. The Offense Conduct Is Particularly Egregious As It Erodes Public Confidence In The Criminal Justice System And Tarnishes Law Enforcement

The Court is already familiar with the detailed charging document that discusses the defendant's conduct and it also sat through his lengthy plea colloquy. Suffice it to say that Bridges' betrayal of the public trust in this case is astonishing, as evidenced by the following conduct:

5

- Stealing and converting to his own personal use hundreds of thousands of dollars' worth of bitcoins while operating in his official capacity as an agent on the Baltimore Silk Road Task Force;
- Transferring the stolen bitcoins overseas to Mt. Gox, a bitcoin exchange operating in Japan;
- Converting the bitcoins to cash totaling more than $820,000, which he transferred via nine separate wires to a corporate account he owned at Fidelity;
- Using his official position to illegally run FINCEN checks to determine whether any Suspicious Activity Reports (SARs) had been filed by Fidelity regarding his wire transfers into his Quantum account all while employed as a federal agent;
- Compromising his office's investigation by burning a website customer support representative, whom they could have used to further infiltrate the Silk Road website;
- Serving as the affiant on a seizure warrant against Mt. Gox a mere two days after transferring the last of his criminal proceeds out of the bitcoin exchange; and
- Trying to cover his tracks by placing one of his computers in a "wipe" area used to delete data from computers and lying about all of the foregoing conduct to federal prosecutors and agents.

In addition, the government believes that defendant Bridges' sentence should be severe given his treatment of the cooperator, GC, in this case. Bridges did not simply steal from Silk Road, he stole from Silk Road and the operator of Silk Road -- whom Bridges knew by his online moniker, "Dread Pirate Roberts" -- through the administrator account of CG. Of course, Ulbricht and a Silk Road administrator believed that CG had stolen from them since they were unaware that CG was cooperating and had given Bridges access to his account. Being a wealthy and dangerous operator of a narcotics trafficking site, Ulbricht responded in a predictable way to the perceived thefts by CG – he looked for associates to murder CG. Bridges was aware that Ulbricht wanted to murder CG almost immediately because Bridges assisted Force and other agents in faking CG's death. Bridges did nothing to prevent Ulbricht's belief – and the belief of the other agents and the AUSAs – that CG was the actual thief. The AUSAs announced that they would not provide CG with a 5K recommendation due to their belief that he had

stolen from Silk Road while promising to be a cooperator. CG protested, but the agents and AUSAs did not believe that one of their own could have been responsible for the theft and did not believe him. That Ulbricht contracted Force's UCE legend of Nob to murder CG was fortuitous because Nob could obviously control his part of the situation by not murdering CG but letting Ulbricht believe that CG had been murdered by Nob. But Bridges did not know that would be the result.

In addition, law enforcement is aware that Ulbricht did not limit his solicitation to murder CG to Force/Nob. Ulbricht actively contacted other Silk Road users that Ulbricht believed could murder CG. That was an eventuality that Bridges, of course, foresaw. The solution for the agents was to order CG not to leave his house until Ulbricht was apprehended almost a year later. CG was confined to his home in fear for his safety day after day. Had the New York-based investigation not located and arrested Ulbricht when it did, CG could have been left to the equivalent of house arrest up to this very day.

This type of abuse of a cooperator is absolutely unforgivable. Bridges allowed his greed and deception to endanger the life of a man who was actively striving to assist the Baltimore Silk Road Task Force with its investigation. When it was obvious to Bridges that his actions were endangering CG's safety and his ability to receive credit for his cooperation, through the threats to withdraw the 5K recommendation, Bridges did nothing. He did not act to save CG and he did not act to correct the misimpression that CG was responsible for the thefts. Bridges could not even bring himself to face CG again, as he flew home on the morning after the thefts and did not even participate in the second day of the proffer as CG was grilled by the other investigators about his role in the thefts. This type of abuse of a vulnerable cooperator strikes a powerful chord with prosecutors and law enforcement who rely on these types of relationships to solve crimes. This type of abuse cannot be taken lightly by federal law enforcement or the Court. Bridges should be sentenced on the basis of his abuse of CG along with his fraudulent and deceitful conduct.

In allowing Bridges to become a Special Agent with the United States Secret Service, the United States entrusted him to act in a manner consistent with standards becoming a sworn law enforcement officer, namely to protect and serve the public. As demonstrated by the facts in this case, Bridges failed miserably on both counts. Likewise, he also proved that he was not deserving of the Secret Service's motto: "Worthy of Trust and Confidence."

### B. Defendant's Conduct Was Not A Single Lapse in Judgment But A Continued Course of Conduct

This Court comes across plenty of defendants who have committed a single -- yet significant -- error in judgment who might deserve a break when it comes time for sentencing. This is not one of those defendants. Like Force, Bridges' crimes do not represent a "one-off" where he experienced a momentary lapse of judgment. Instead, Bridges committed crimes over the course of many months (if not years) during which he had time to reflect on what he was doing over and over again, and to come forward and it admit his crimes. Yet instead of ceasing his misconduct after one incident, he continued with impunity until he was caught. His was an extremely calculated effort, designed to avoid detection for as long as possible, ironically using the very skills (e.g., computer skills) that he learned on the job and at the public's expense.

As a member of the Baltimore Silk Road Task Force, Bridges was assigned to, among other responsibilities, forensic computer investigations in an effort to locate, identify, and prosecute targets of the task force, including Ross Ulbricht, and other vendors, buyers, and administrators on Silk Road. *See* Plea Agreement, Dkt. No. 60 at p.4  In his role performing forensic computer analysis, Bridges investigated a customer support representative on Silk Road, "C.G.," in connection with C.G. assisting in the delivery of approximately one kilogram of cocaine to an undercover identity controlled by Carl Force, another task force member. On January 17, 2013, Bridges participated in a search and arrest of C.G. for possession with intent to distribute cocaine. PSR ¶ 15.

On January 25, 2013, Bridges participated in an interview of C.G. During the interview, C.G. described his administrator access to Silk Road as a customer support representative and his ability to reset passwords and pins of account holders on Silk Road. C.G. also shared his administrator access and password with the interviewing agents. Later that day, Bridges accessed Silk Road through a computer utilizing C.G.'s administrator access. Bridges reset passwords and pins of various accounts on Silk Road and moved bitcoin from those accounts into a "wallet" he controlled. In this manner, Bridges fraudulently moved and stole approximately 20,000 bitcoin from Silk Road and Silk Road accounts. On January 26, 2013, Bridges moved the stolen bitcoin into an account at Mt. Gox, an online digital currency exchange based in Japan. Dkt. No. 60 at p.4.

8

On January 26, 2013, Ulbricht learned that C.G.'s access to Silk Road had been used to fraudulently transfer bitcoin from Silk Road into a wallet. Ulbricht canceled CG's administrator access to Silk Road. Later that day, Ulbricht communicated with Force's undercover persona, "Nob," and sought to hire "Nob" to murder C.G. in retaliation for the bitcoin thefts. On January 27, 2013, Bridges, acting as an undercover persona on Silk Road, "Number13," communicated with Ulbricht in an effort to falsely and fraudulently prevent Ulbricht from learning who had committed the theft from Silk Road. Using the "Number13" persona, Bridges communicated that he had been the victim of the theft, rather than its perpetrator, and that he wanted his bitcoin returned to him. *Id.*

On February 12, 2013, Bridges formed Quantum and registered it with the Maryland Secretary of State. On February 22, 2013, Bridges opened a personal investment account at Fidelity under the Quantum name but controlled by Bridges. Between March 6, 2013, and May 7, 2013, Bridges liquidated the bitcoin in the Mt. Gox account, proceeds of the Silk Road fraud, into U.S. Currency and transferred the money into his Quantum Fidelity account via nine separate wire transfers, each one under $100,000. Subsequently, during June of 2014, Bridges transferred money from the Quantum Fidelity account into a joint bank account in his name and that of another person. *Id.*

Bridges had an opportunity to come clean for his crimes and take responsibility when, in November 2014, he was interviewed by federal prosecutors and agents. He was asked about his role in some of this conduct and he lied repeatedly during a lengthy interview. This forced the government to conduct an intricate and time-intensive investigation, taking resources away from other cases in the process. Although Bridges ultimately admitted his conduct, he did not do so for over a year and only after he knew he would be charged. The Court should take into account that the defendant's offenses were a continued course of conduct that spanned a relatively long period of time, a period in which there was ample opportunity for the defendant to reflect on what he had been doing and realize it was very wrong.

**C.     Defendant's Conduct Jeopardized A Sensitive, Multi-Year, Multi-Agency Investigation**

Like Force, Bridges was part of the Baltimore Silk Road Task Force, which, together with the U.S. Attorney's Office for the District of Maryland, had been building a case against the Silk Road operator, i.e., Ross Ulbricht. This task force comprised numerous agencies – IRS, USPIS, DEA, and HSI – and it

9

had been working on the investigation into the Silk Road for years. Given Bridges' role as the computer forensics expert on the task force, it was obvious to Bridges that he might be a key witness for the government in any future prosecution in Maryland. In stealing bitcoins from the Silk Road website and compromising a website administrator who was willing to cooperate with the investigation, Bridges not only made that evidence unavailable to the Baltimore prosecution, he tampered with key evidence that would presumably form some of the government's case at any eventual trial. Rather than working to take down the Silk Road – what he was being paid with taxpayer dollars to do – Bridges worked to line his own pockets with more than $820,000. In so doing he acted with reckless disregard for the potential for his actions to jeopardize the murder-for-hire and drug conspiracy case that the District of Maryland brought against Ulbricht.

### D.   A Lengthy Prison Sentence Is Needed To Promote Both Deterrence And Promote Respect For the Law

A long sentence is also important to afford adequate deterrence to criminal conduct in the future – not only by Bridges – but by any other would-be corrupt official within the government. The Court should send a message that this kind of conduct will be met with a harsh penalty in the form of a lengthy prison sentence. Because a trustworthy workforce is absolutely essential to the mission of the Secret Service and the myriad other federal and state agencies who serve the public, deterring this kind of behavior is of the upmost importance. Other government employees will look to what sentence Bridges gets as an example of what could happen to them if they were to betray the public trust. The message, accordingly, must be that this kind of conduct will result in a lengthy custodial sentence.

Finally, Section 3553(a)'s provision for a sentence that "promotes respect for the law" must also be considered. At the time of his criminal activity, the defendant's legitimate work with the Secret Service involved investigating dark net sites and those using them to commit crimes. In the midst of all of this he stole bitcoins from the targeted website and converted them to cash, which he then deposited to his own investment account. It is critical that people understand and believe that when a law enforcement agent gets caught committing these kinds of crimes, he/she will be dealt with severely by the system of which he/she was once a part.

### E. The Court Should Sentence Bridges To A Lengthy Prison Sentence In Order To Avoid Unnecessary Sentencing Disparities

The Court should sentence Bridges to a term of incarceration at the top end of the Guidelines range. Such a sentence is consistent with the sentence sought by the government for Carl Force who was sentenced last month in a related case. As the Court is aware, Force was sentenced to a term of incarceration of 78 months, which was the mid-point of his Guidelines range. The United States believes that a term of incarceration of 71 months in this case is the appropriate sentence given Bridges' egregious conduct on the same task force.

### F. There Is No Basis For Either a Downward Departure Or A Variance In This Case

Finally, as indicated above, there is no basis for the Court to depart downward from the applicable Guideline range – a conclusion echoed by the Probation Office. *See* PSR ¶ 107. Additionally, there is no valid basis for a downward variance. To the extent Bridges may try to advance an argument that he should receive a lower than Guidelines sentence pursuant to U.S.S.G. § 5H1.4, there is no evidence to indicate that alcohol abuse played any role in his decision to commit the crimes to which he pled guilty. Nor is there any reason to believe that the BOP could not provide him with any treatment that might be warranted during the period of his incarceration. Any such argument to the contrary should be rejected.

### CONCLUSION

The government submits that only a high-end Guidelines sentence is reasonable and appropriate in this case given the nature and circumstances of the offense, the need to promote respect for the law, and for purposes of deterrence. In full consideration of these sentencing goals, together with the defendant's history and characteristics, the United States respectfully requests that the Court impose a sentence of 71 months' imprisonment, as well as a 3-year term of supervised release.

DATED: November 30, 2015                                      Respectfully submitted,

                                                              BRIAN J. STRETCH
                                                              Acting United States Attorney


                                                              _____/s/_____
                                                              KATHRYN HAUN
                                                              WILLIAM FRENTZEN
                                                              Assistant United States Attorneys

11

RICHARD B. EVANS
Public Integrity Section